

# In the
# Missouri Court of Appeals
## Western District

| | | |
|---|---|---|
| STATE OF MISSOURI, | ) | |
| | ) | |
| Respondent, | ) | WD76857 |
| | ) | |
| v. | ) | OPINION FILED: April 21, 2015 |
| | ) | |
| WILLIAM DARRELL JOYNER, | ) | |
| | ) | |
| Appellant. | ) | |

**Appeal from the Circuit Court of Macon County, Missouri**
The Honorable Frederick P. Tucker, Judge

Before Division One: Cynthia L. Martin, Presiding Judge, Thomas H. Newton, Judge
and Mark D. Pfeiffer, Judge

William Darrell Joyner ("Joyner") appeals from the trial court's judgment

convicting him of one count of aggravated stalking in violation of section 565.225.[1]

Joyner asserts that the trial court erred in overruling his counsel's objection and request

for a mistrial when his twelve-year-old victim testified that she was afraid of Joyner

because he was a registered sex offender, and in overruling his counsel's objection to the

State's discussion of this testimony during closing argument. Joyner also asserts error in

---

[1] All statutory references are to RSMo 2000 as supplemented unless otherwise indicated. All references to section 565.225 refer to the version adopted and effective in 2008 except as otherwise indicated.

the admission of other evidence, in instructing the jury, and in failing to grant his motion for judgment of acquittal at the close of the evidence.

Because, under the circumstances in this case, evidence of Joyner's status as a registered sex offender was inadmissible propensity evidence that was outcome determinative, we reverse and remand this matter for a new trial.

## Factual and Procedural History[2]

The victim, a twelve-year-old female, lived with her father and stepmother in Macon. Joyner, a 45-year-old man, attended the same church as the victim and her family. The victim's family invited Joyner to live in their home in December 2012.

On January 25, 2013, Joyner told the victim's stepmother that he had romantic feelings for the victim. Joyner said that he believed he and the victim were "soul mates." Three days later, the victim's father and stepmother told Joyner to move out of their home and to discontinue communication with the family. Joyner went into the restroom to whisper something in the victim's ear before he left the residence.

Also before he left the home, Joyner gave letters to the victim's father and stepmother and to the victim. The letter to the victim's father and stepmother reinforced his feelings toward the victim, apologized for opening up to the two about his feelings toward the victim, and asked for their forgiveness. Joyner's letter to the victim stated that he was returning poems she had written to him[3] and that the feelings expressed in the

---

[2]We view the facts in the light most favorable to the jury's verdict. *State v. Jackson*, 410 S.W.3d 204, 209 n.3 (Mo. App. W.D. 2013).
[3]These poems were included in a Christmas gift the victim's family gave to Joyner that the family referred to as a "girlfriend in a box." According to the victim's stepmother, Joyner asked for a girlfriend for Christmas, so the victim's stepmother, the victim's friend, and the victim herself wrote love notes to Joyner from a hypothetical

2

victim's poems were consistent with Joyner's feelings about the victim. Shortly after Joyner was asked to leave the family's home, the victim's father and stepmother told the victim that Joyner was a registered sex offender. There was no evidence that Joyner was aware that the victim knew that he was a registered sex offender.

Joyner continued to communicate with the victim's stepmother via text message. Stepmother told the victim about the text messages. Among Joyner's text messages were questions about whether the victim's stepmother was driving the victim to school. In one text message, Joyner stated: "I got a feeling yesterday that you were [giving the victim a ride to school], so today I parked at the hospital parking lot to see. Don't know for sure but that's what I think. It's kind of what it looked like to me."

On February 9, 2013, Joyner parked near the victim's home. Joyner walked toward the home and into the yard. The victim saw Joyner through the storm door. Once the victim spotted Joyner, he turned and ran back down the street toward his vehicle.

Shortly thereafter, the victim and her family saw Joyner at church. Joyner entered the church and sat behind the victim who was sitting in a pew next to her stepmother. The victim moved to sit with a friend, and Joyner moved to sit directly behind the victim. When the victim's father entered the church, the victim moved to sit next to her father. Joyner again moved and sat directly behind the victim.

---

girlfriend. The three put the love notes as well as candy, popcorn, a movie, and flowers in a box and gave a "girlfriend in a box" to Joyner for Christmas. At the time of the gift, Joyner had not yet expressed that he had romantic feelings for the victim.

The victim's stepmother filed a complaint with the Macon Police Department. Sometime thereafter, Joyner was arrested in the parking lot of an apartment complex located approximately three blocks from the victim's home.

After his arrest, Joyner admitted to the police that "he had a deep love for [the victim], that he thought they were soul mates, [and] that they were meant to be together." Joyner also told the police about his contact with the family via text messages. Joyner informed the police that he had been to the victim's house twice since moving out, once to drop off pallets and once when he saw the victim through the storm door. Finally, Joyner admitted that when he noticed the victim was no longer at the school bus stop in the mornings, he sat in his vehicle in a parking lot to determine how the victim was getting to school.

The State charged Joyner with one count of aggravated stalking in violation of section 565.225. At trial, the State claimed the acts of giving the victim a letter, observing the victim at her home, following the victim during a church service, and going to a hospital parking lot to observe the victim, constituted stalking via course of conduct. The jury returned a verdict finding Joyner guilty of aggravated stalking and recommending a four-year sentence and a fine to be determined by the trial court. The trial court entered its judgment finding Joyner guilty of aggravated stalking, sentencing Joyner to four years imprisonment, and assessing a $2,500 fine.

Joyner appeals.

4

## Analysis

## Points One and Two

Joyner asserts six points on appeal. His first two points are related and dispositive.[4] In his first point, Joyner argues that the trial court erred in overruling his objection and request for a mistrial when the victim testified that she was afraid of Joyner because he was a registered sex offender. In his second point, Joyner argues that the trial court erred in overruling his objection to the State's discussion of this testimony during closing argument. Joyner argues that his status as a registered sex offender was "highly prejudicial character propensity evidence relied on to establish [his] guilt of aggravated stalking." The resolution of both points on appeal turns on the admissibility of the victim's testimony, as reference to the testimony during closing argument was not improper if the evidence was properly admitted. *State v. McFadden*, 369 S.W.3d 727, 748 (Mo. banc 2012).

The trial court has broad discretion in determining whether to admit or exclude evidence. *State v. Oerly*, 446 S.W.3d 304, 310 (Mo. App. W.D. 2014). Thus, we review the trial court's decisions regarding the admission of evidence for an abuse of discretion. *Id.* The trial court abuses its discretion if its ruling is clearly against the logic of the circumstances and is so arbitrary and unreasonable as to shock the sense of justice and

---

[4]Joyner's third point on appeal claims error in overruling his counsel's objection and request for a mistrial when the victim's stepmother testified, at the trial court's urging, that she was "not the only person that [Joyner] has done this to." Joyner's fourth point on appeal claims error in the admission of evidence that Joyner had two guns in his car at the time of his arrest. Joyner's fifth point on appeal claims error in failing to define "harasses" and "course of conduct" in the verdict director. Joyner's sixth point on appeal claims error in denying his motion for judgment of acquittal at the close of the evidence. Because Joyner's first and second points on appeal result in the reversal of Joyner's conviction, we need not determine Joyner's remaining points on appeal.

5

indicate a lack of careful consideration. *State v. Marquis*, 446 S.W.3d 311, 317 (Mo. App. W.D. 2014). An abuse of discretion in admitting evidence does not assure reversal of a conviction unless prejudice is demonstrated, established by proof that admission of the evidence was outcome determinative. *State v. Adams*, 350 S.W.3d 864, 866 (Mo. App. E.D. 2011). "A finding of outcome-determinative prejudice 'expresses a judicial conclusion that the erroneously admitted evidence so influenced the jury that, when considered with and balanced against all of the evidence properly admitted, there is a reasonable probability that the jury would have reached a different conclusion but for the erroneously admitted evidence.'" *State v. Barriner,* 34 S.W.3d 139, 150 (Mo. banc 2000) (citations omitted) (quoting *State v. Roberts*, 948 S.W.2d 577, 592 (Mo. banc 1997)). In determining whether improperly admitted evidence is outcome determinative, the State is "not entitled to the benefit of all reasonable inferences from the evidence, as in a review for the sufficiency of the evidence." *State v. Driscoll*, 55 S.W.3d 350, 357 (Mo. banc 2001).

### The Victim's Testimony

When the victim was on the stand, she was asked why she did not want Joyner living with her family anymore. The victim testified that she "was scared of him." The State then asked the victim:

Q: Why were you scared of him . . . ?

A: Because he was a registered sex offender.

Joyner's counsel immediately asked to approach the bench, where she objected and sought a mistrial. Joyner's counsel noted "[w]e have already agreed that that stays out by

6

our motions *in limine*.[5]  I re-enact [sic] those, and then also it directly goes to his convictions, Your Honor, being a registered sex offender because of his prior convictions."

The State did not express surprise at the victim's testimony.  Rather, in response to Joyner's objection and request for a mistrial, the State argued:

> Judge, **it shows her state of mind**.  We're talking about **what this little girl thinks** is reasonable.  And if that's one of the reasons she was scared, then **that goes directly to proving this crime**.  She knew about that during the time of the charged conduct.

(Emphasis added.)  In short, the State argued that the victim's state of mind was an essential element of the crime of aggravated stalking.[6]

The trial court overruled Joyner's objection and denied Joyner's request for a mistrial.  Immediately thereafter, the State again inquired of the victim:

Q:    [W]hy were you scared of him?

A:    Because he was a registered sex offender.

Q:    ***Is that the only reason you were scared of him?***

A:    ***Yes***.

(Emphasis added.)  The victim was then asked to describe how she learned of Joyner's status from her parents.  During closing argument, the State emphasized the victim's testimony about Joyner's status as a registered sex offender over Joyner's objection.

---

[5]The *in limine* proceedings are discussed in greater detail, *infra*.

[6]The State did not argue this basis for admission of evidence of Joyner's status as a registered sex offender during the *in limine* hearing conducted shortly before trial, as we discuss in greater detail, *infra*.

7

*The Limited Admissibility of Evidence of Prior Uncharged Conduct*

Joyner's status as a registered sex offender is prior uncharged conduct.[7] "It is a well-established rule that 'proof of the commission of separate and distinct crimes is not admissible unless such proof has some legitimate tendency to directly establish the defendant's guilt of the charge for which he is on trial.'" *State v. Primm*, 347 S.W.3d 66, 70 (Mo. banc 2011) (quoting *State v. Vorhees*, 248 S.W.3d 585, 587 (Mo. banc 2008)). "The rationale for . . . exclusion is to prevent such evidence from being admitted for the purpose of demonstrating the defendant's propensity to commit the crime with which he is presently charged." *Id.* (citing *State v. Ellison*, 239 S.W.3d 603, 606 (Mo. banc 2007)). The "rule is grounded in the view that 'evidence of other crimes, when not properly related to the cause on trial, violates defendant's right to be tried for the offense for which he is indicted.'" *Vorhees*, 248 S.W.3d at 587 (quoting *State v. Sladek*, 835 S.W.2d 308, 311 (Mo. banc 1992)). "This right arises from the guarantee of article I, sections 17 and 18(a) of the Missouri Constitution that a defendant has the right to be tried only on the offense charged." *Id.* at 587-88 (citing *State v. Burns*, 978 S.W.2d 759, 760 (Mo. banc 1998)).

If evidence of prior uncharged conduct is offered for a reason other than demonstrating a defendant's propensity to commit the crime charged, and is logically and legally relevant for that alternative purpose, then the evidence is not propensity evidence and is admissible. *Ellison*, 239 S.W.3d at 606-07. The recognized alternative bases for

---

[7]We use the phrase "prior uncharged conduct" because we are referring to prior conduct that is not charged as a crime in this case. "Prior uncharged conduct" can include prior criminal convictions, or simply prior bad acts. Recognized treatises refer to this category of evidence in the same manner. *See, e.g.,* Edward J. Imwinkelried, *Uncharged Misconduct Evidence* (rev. ed. 1999).

8

admission of evidence of prior uncharged conduct "are as well established as the rule itself." *Sladek*, 835 S.W.2d at 311.

> Such evidence may be admissible if it tends to establish (1) motive; (2) intent; (3) the absence of mistake or accident; (4) a common scheme or plan embracing the commission of two or more crimes so related to each other that proof of one tends to establish the other; or (5) the identity of the person charged with commission of the crime on trial. In addition, evidence of uncharged crimes that are part of the circumstances or the sequence of events surrounding the offense charged may be admissible "to present a complete and coherent picture of the events that transpired."

*Primm*, 347 S.W.3d at 70 (citation omitted) (quoting *State v. Thurman*, 272 S.W.3d 489, 495 (Mo. App. E.D. 2008)). This list of exceptions to the general rule prohibiting admission of evidence of prior criminal conduct is not exhaustive. *State v. Bernard*, 849 S.W.2d 10, 13 (Mo. banc 1993). However, "[t]he criteria of logical and legal relevance are not intended as a loophole for evading the general ban on propensity evidence." *Ellison*, 239 S.W.3d at 607. "A finding of legal and logical relevance will *never* provide a basis for the admission of prior criminal acts evidence for the purpose of demonstrating a defendant's propensity." *Id.*

At trial, the State did not argue that Joyner's status as a registered sex offender was logically relevant because it tended to prove one of the recognized exceptions to the general prohibition against admitting evidence of prior criminal conduct. Instead, the State argued that the victim's knowledge of Joyner's status as a registered sex offender was logically relevant to establish an essential element of the crime of aggravated stalking--the victim's state of mind.

9

*The Victim's State of Mind Is Not an Essential Element of the Crime of Stalking*

Section 565.225.2 describes the crime of stalking:

> A person commits the crime of stalking if he or she purposely, through his or her course of conduct, harasses or follows with the intent of harassing another person.

"Stalking" is elevated to "aggravated stalking" with the additional proof of any one of five aggravators described in section 565.225.3. Applicable to this case is section 565.225.3(4):

> At any time during the course of conduct, the other person is seventeen years of age or younger and the person harassing the other person is twenty-one years of age or older . . . .

"Course of conduct" and "harasses" are statutorily defined. "Course of conduct" is defined, in pertinent part, as "a pattern of conduct composed of two or more acts, which include communication by any means, over a period of time, however short, evidencing a continuity of purpose." Section 565.225.1(1). "Harasses" is defined as "to engage in a course of conduct directed at a specific person that serves no legitimate purpose, that would cause a reasonable person under the circumstances to be frightened, intimidated, or emotionally distressed." Section 565.225.1(3).

Plainly, the victim's *subjective* state of mind is not an essential element of the crime of stalking. Our conclusion is solidified by the fact that prior to its amendment in 2008, "harasses" was defined as "engag[ing] in a course of conduct directed at a specific person that serves no legitimate purpose, that would cause a reasonable person to suffer substantial emotional distress, *and that actually causes substantial emotional distress to that person*." Section 565.225.1(3), RSMo 1994 (emphasis added). Though prior to

10

2008, the State had to prove that a defendant's course of conduct *in fact* caused a victim to suffer "substantial emotional distress," after 2008, the State was relieved of this burden.

As the proponent of the victim's testimony, it was the State's burden to establish its relevance, and thus its admissibility. *State v. Allen*, 274 S.W.3d 514, 528 (Mo. App. W.D. 2008). Evidence is logically relevant only if it has "some legitimate tendency to establish the guilt of the accused for the charges for which he is on trial." *State v. Peal*, 393 S.W.3d 621, 627 n.7 (Mo. App. W.D. 2013). The State argued at trial that the victim's testimony was logically relevant to prove the victim's state of mind, a non-existent essential element of the crime of aggravated stalking. It was an abuse of discretion to admit the victim's testimony for this purpose.

### *The Victim's Knowledge of Prior Uncharged Conduct Was Not Relevant on This Record to Determine How a Reasonable Person "Under the Circumstances" Would Have Reacted to Joyner's Course of Conduct*

Though the State failed to argue a tenable basis for admission of the victim's testimony at trial, our standard of review requires us to affirm the admission of the victim's testimony if tenable on some other basis. "[A] correct ruling on the admissibility of evidence will be upheld though the trial court may have justified it for an erroneous reason." *Pike v. Pike*, 609 S.W.2d 397, 403 (Mo. banc 1980) (citing *Sampson v. Mo. Pac. R.R. Co.*, 560 S.W.2d 573, 586 (Mo. banc 1978)); *see also Bynote v. Nat'l Super Mkts., Inc.*, 891 S.W.2d 117, 123 (Mo. banc 1995) ("If any valid basis existed for the admission of [evidence], defendant suffered no prejudice from the error and the trial court's judgment will not be disturbed.").

11

On appeal, the State argues a different rationale for admission of the victim's testimony than was argued at trial. The State argues that the "[v]ictim's knowledge that [Joyner] was a registered sex officer was directly relevant to the jury's determination of whether his conduct would cause a reasonable person under the circumstances to be frightened, intimidated, or emotionally distressed." [State's Brief p. 16]. The State thus argues that the phrase "under the circumstances," which is drawn from the statutory definition of "harasses," renders logically relevant *any* fact or circumstance that could tend to influence a reasonable person's reaction to a defendant's course of conduct. The State's construction of "under the circumstances" would permit prior uncharged conduct to be admitted in every stalking case so long as the victim had knowledge of the prior uncharged conduct. We cannot accept the State's broad construction of the phrase "under the circumstances" as it fails to account for the fact that stalking is a specific intent crime.

As noted, section 565.225.2 criminalizes stalking, described as: "purposely, through his or her course of conduct, harasses or follows with the intent of harassing another person." Discerning the manner in which this crime can be committed is a more complicated exercise than might first appear.[8] The commas in section 565.225.2 cause some question as to whether "purposely" modifies "through his or her course of conduct," "harasses," and/or "follows;" and as to whether the phrase "through his or her course of conduct" modifies "harasses" and/or "follows." To further complicate the matter, "course of conduct" is defined by section 565.225.1(1) to include any "act." Any "act" would

---

[8]The complications arose following the amendment of Section 565.225 in 2002. Prior to that time, stalking was described as: "Any person who purposely and repeatedly harasses or follows with the intent of harassing another person commits the crime of stalking." Section 565.225.2, RSMo 2000.

plainly encompass "following." Yet section 565.225.2 appears to differentiate between "course of conduct" and "following." Also lending to the confusion is the fact that section 565.225.2 uses the terms "harasses" and "course of conduct," both defined terms. Yet the statutory definition of "harasses" also uses the term "course of conduct." When the statutory definitions of "course of conduct" and "harasses" are substituted into section 565.225.2 in lieu of the defined terms themselves, we are left with a nearly indecipherable statute:

> A person commits the crime of stalking if he or she purposely, through his or her [*pattern of conduct composed of two or more acts, which may include communication by any means, over a period of time, however short, evidencing a continuity of purpose*], [**engag[es] in a** {*pattern of conduct composed of two or more acts, which may include communication by any means, over a period of time, however short, evidencing a continuity of purpose*} **directed at a specific person that serves no legitimate purpose, that would cause a reasonable person under the circumstances to be frightened, intimidated, or emotionally distressed**] or follows with the intent of [**engage[ing] in a** {*pattern of conduct composed of two or more acts, which may include communication by any means, over a period of time, however short, evidencing a continuity of purpose*} **directed at a specific person that serves no legitimate purpose, that would cause a reasonable person under the circumstances to be frightened, intimidated, or emotionally distressed**] another person.[9]

Our role in determining the meaning of a criminal statute is "to ascertain the intent of the legislature from the language used and give effect to that intent, if possible." *State v. Chambers*, 437 S.W.3d 816, 820 (Mo. App. W.D. 2014) (internal quotation marks omitted). "Every word, clause, sentence and section of a statute should be given meaning, and under the rules of statutory construction statutes should not be interpreted

---

[9]References in bold text are to the statutory definition of "harasses." Section 565.225.1(3). References in italicized text are to the statutory definition of "course of conduct." Section 565.225.1(1).

13

in a way that would render some of their phrases to be mere surplusage." *State v. Graham*, 149 S.W.3d 465, 467 (Mo. App. E.D. 2004).

Applying these principles, section 565.225.2 must be construed to provide two avenues for its violation: "A person commits the crime of stalking if he or she [1] purposely, through his or her course of conduct, harasses *or* [2] follows with the intent to harass."[10] (Emphasis added.) We reach this conclusion for several reasons.

First, though "course of conduct" is defined to include any "act," and though "following" is plainly an "act," the legislature appears to have intended the act of "following" to support a conviction for stalking if merely the *intent* to harass is established. In contrast, a course of conduct *other than following* will support a conviction for stalking only if the conduct actually harasses. Second, the word "purposely" appears intended to modify the word "harasses." The intervening parenthetical "through his or her course of conduct" (with "course of conduct" statutorily defined to require a pattern of conduct establishing a "continuity of purpose") describes *how* a culpable defendant must "purposely harass" in order to be charged with stalking. "Purposely" could also be read to modify "follows," although it would be superfluous to do so. The act of following is not subject to charge *unless* engaged in with the intent to harass--that is to say, for the purpose of harassing--whether or not harassing actually results. Though actual harassment need not be established in "following" cases, the intent to cause that result eliminates by its natural operation acts of "following" that are

---

[10]Consistent with our construction of section 565.225.2 (and, thus, of section 565.225.3 addressing aggravated stalking), the verdict directors for stalking and aggravated stalking set forth, respectively, in MAI-CR 319.40 and MAI-CR 319.42 differentiate between stalking by "purposely harass[ing]" though a course of conduct, and stalking by "following with the intent [to] harass[]."

14

unintentional or legitimate. Third, because the word "harass" is used in connection with both means by which stalking can be charged and because the statutory definition of "harasses" uses the term "course of conduct," (itself a defined term), stalking, whether by "purposely, through a course of conduct, harass[ing]" or by "follow[ing] with the intent to harass," will require proof of a pattern of conduct involving two or more acts evidencing a continuity of purpose. And finally, with respect to either manner in which stalking may be charged, the State must establish not merely that the charged conduct occurred but that it was engaged in with the requisite *mens rea*. In the case of stalking by "purposely, through a course of conduct, harass[ing]," the State must prove that a defendant purposely harassed. In the case of stalking by "follow[ing] with the intent to harass," the State must prove the intent to harass.[11]

Here, Joyner was charged with aggravated stalking of the "course of conduct" variety.[12] The State was thus required to establish the following essential elements:

(1)    Joyner, through a course of conduct;

(2)    Purposely harassed the victim;

(3)    At a time when the victim was seventeen years of age or younger and Joyner was twenty-one years of age or older.

"A person 'acts purposely,' or with purpose, with respect to his conduct or to a result thereof when it is his conscious object to engage in that conduct or to cause that

---

[11]If culpability for stalking through a course of conduct other than following only required proof of purposeful conduct without proof of the purpose to harass through that conduct, then stalking through a purposeful course of conduct would be rendered a strict liability crime. Such a construction would also render section 565.225 incongruent, as stalking by following expressly requires proof of an "intent to harass." We do not believe the legislature intended some conduct (following) to require proof of a *mens rea*, while all other conduct would not.

[12]The State submitted the case against Joyner using a modified version of MAI-CR 319.42, the aggravated stalking verdict director for the means of violation section 565.225 that involves stalking by "purposely, through his or her course of conduct, harassing."

15

result."  Section 562.016.2.  "Purposely" does not require a demonstration of malice. *State v. Whalen*, 49 S.W.3d 181, 187 (Mo. banc 2001).  However, purposely does equate with specific intent.  *Bryant v. State*, 316 S.W.3d 503, 509 (Mo. App. E.D. 2010) (citing *Whalen*, 49 S.W.3d at 186).  In the case of section 565.225.2, as we have already explained, "purposely" modifies "harasses," and "purposely harasses" must occur ***through a course of conduct***.

Because stalking (or aggravated stalking) is a specific intent crime, it follows that before a "circumstance" can be considered in determining how a reasonable person would react to a course of conduct, it must be established that the circumstance tends to prove the defendant's purpose to harass through the course of conduct.  If the phrase "under the circumstances" is not construed in this fashion and is instead read as the State suggests to render logically relevant ***any*** fact or circumstance merely because it might influence a reasonable person's reaction to a course of conduct, the *mens rea* requirement of section 565.225.2 would be rendered meaningless.  A jury could convict a defendant for stalking based on "circumstances" that are in no manner connected to the defendant purposely, *through his or her course of conduct*, harassing.  Where the "circumstance" in question is a defendant's prior uncharged conduct, a jury could thus convict a defendant based solely on a reasonable person's reaction to the prior uncharged conduct--the very essence of propensity evidence.  *State v. Shockley*, 410 S.W.3d 179, 193 (Mo. banc 2013) ("Propensity evidence is evidence of uncharged crimes, wrongs, or acts used to establish that [a] defendant has a natural tendency to commit the crime charged." (internal quotation marks omitted)).

16

In contrast, if "under the circumstances" refers, as we conclude, to circumstances that could influence a reasonable person's reaction to a course of conduct *and* that tend to prove the defendant's purpose to harass through the course of conduct, then no defendant is at risk of conviction based on other than his charged course of conduct. Plainly, this logical relevance standard would be met where a defendant is aware of his or her victim's knowledge of a "circumstance" that would influence a reasonable person's reaction to a course of conduct and thereafter engages in the course of conduct with that awareness. Applied to prior uncharged conduct, if a defendant is aware of a victim's knowledge of prior uncharged conduct and thereafter engages in a charged course of conduct, then the victim's knowledge of the prior uncharged conduct is logically relevant to establish the defendant's purpose to harass so long as the prior uncharged conduct is of a nature that it would couple with the course of conduct to cause a reasonable person to feel frightened, intimidated, or emotionally distressed. This is not a groundbreaking observation. It is, instead, a routine example of the logical relevance of prior uncharged conduct to establish intent. *Primm*, 347 S.W.3d at 70.

The two cases cited by the State in its Brief support this construction of the phrase "under the circumstances." In *State v. Martin*, 940 S.W.2d 6, 8 (Mo. App. W.D. 1997), the defendant did not claim error in the admission of prior uncharged conduct evidence but instead argued that there was insufficient evidence to establish that his conduct "actually caused [the victim] to experience 'substantial emotional distress.'" *Martin* thus addressed the version of section 565.225 that is no longer in effect and that required the State to prove that a victim in fact suffered substantial emotional distress. *Id.* In

17

concluding that the evidence was sufficient to establish this now non-existent element, we summarized the defendant's conduct, including the defendant's *earlier violent treatment of the victim* which caused her to move into a domestic violence shelter. *Id.* at 9. Had the admissibility of the prior uncharged conduct been the issue raised by the defendant in *Martin* (which it was not), we have no doubt that the court would have concluded that the defendant's prior uncharged conduct *directed at the victim* was logically relevant to establish one of the recognized exceptions to admission of prior uncharged conduct evidence. *See, e.g.*, *State v. Richardson*, 918 S.W.2d 816, 818 (Mo. App. W.D. 1996) ("As to evidence of uncharged misconduct involving the victim . . . [s]uch evidence is admissible to establish motive, intent, absence of mistake or accident, or a common scheme or plan." (citation omitted)). Specifically, we have no doubt that the court would have concluded that prior uncharged conduct *directed at the victim* is a "circumstance" that is logically relevant to prove the defendant's purpose to harass through his course of conduct. *See, e.g.*, *State v. Mabry*, 285 S.W.3d 780, 785-86 (Mo. App. E.D. 2009) (holding that stalking defendant's prior misconduct toward his stalking victim was relevant to show that the victim "was reasonably 'alarmed'" by the stalking course of conduct). Plainly, a defendant's awareness that his victim knows of prior uncharged conduct directed at the victim tends to prove that the defendant engaged in a course of conduct aware that the conduct would exploit pre-existing feelings of fear and intimidation.

In *State v. Wayman*, 926 S.W.2d 900, 902 (Mo. App. W.D. 1996), the defendant was charged with stalking a minor. The State offered and the trial court admitted a class

reunion book given to the victim's mother by the defendant. *Id.* at 905. The defendant had advised the victim of his intent to deliver the book to the victim's mother. *Id.* at 903. The book included an excerpt written by the defendant describing his life of crime since graduation and his incarceration in a maximum security prison. *Id.* at 905. The book was given to the mother in the midst of the defendant's stalking conduct. *Id.* On appeal, the defendant complained that the book was not relevant. *Id.* at 904-05. We concluded that the book was relevant. *Id.* at 905. Specifically, we held that:

> ***Having been given the book by [the defendant], [the minor and his parents] were aware of his claim of past criminal behavior*. *This heightened their anxiety and distress upon receiving the letters, phone calls, pictures and other items that [the defendant] sent.*** This was key to establishing the severe emotional distress experienced by [the minor] which the state had to prove as an element of the stalking charge.

*Id.* (emphasis added).

*Wayman's* holding regarding the relevancy of evidence to prove that a victim in fact suffered severe emotional distress is no longer of value, for reasons we have explained. However, *Wayman's* emphasis on the defendant's awareness of the victim's knowledge of his prior uncharged conduct remains instructive. The victim's knowledge of Wayman's prior uncharged conduct was a circumstance that was logically relevant to prove Wayman's purpose to harass through his course of conduct ***because*** Wayman made the revelation about his prior uncharged conduct to the victim and thus engaged in his course of conduct aware that the victim would experience with heightened anxiety.

In summary, a victim's subjective knowledge of prior uncharged conduct is a logically relevant "circumstance" if the evidence establishes that the defendant engages in

a charged course of conduct aware of the victim's knowledge and if the prior uncharged conduct is of a nature that it would couple with the charged conduct to cause a reasonable person to feel frightened, intimidated, or emotionally distressed.[13] In the face of such evidence, a jury can infer intent--that is the purpose to harass through a course of conduct--because the defendant is aware that his or her course of conduct will be perceived with heightened sensitivity in light of the victim's knowledge.[14]

The State has never argued, even on appeal, that the victim's testimony about her knowledge of Joyner's status was logically relevant to prove Joyner's purpose to harass. We must nonetheless determine whether the trial court could have admitted the testimony on that basis. *Pike*, 609 S.W.2d at 403. Shortly after Joyner's objection and request for a mistrial were overruled, the State inquired about the source of the victim's knowledge of Joyner's status as a registered sex offender:

---

[13]Once logical relevance is established, a trial court must assess legal relevance. *State v. Anderson*, 76 S.W.3d 275, 276 (Mo. banc 2002). "The general rule in Missouri is that relevance is two-tier: logical and legal." *Id.* "Evidence is logically relevant if it tends to make the existence of a material fact more or less probable." *Id.* In other words, the evidence must have "some legitimate tendency to establish the guilt of the accused for the charges for which he is on trial." *State v. Peal*, 393 S.W.3d 621, 627 n.7 (Mo. App. W.D. 2013). "Logically relevant evidence is admissible only if legally relevant." *Anderson*, 76 S.W.3d at 276. "Legal relevance weighs the probative value of the evidence against its costs--unfair prejudice, confusion of the issues, misleading the jury, undue delay, waste of time, or cumulativeness." *Id.* "Thus, logically relevant evidence is excluded if its costs outweigh its benefits." *Id.*

[14]In fact, there are numerous examples of cases involving crimes requiring proof of a victim's fear or intimidation. In those cases, a defendant's prior bad or criminal conduct was found to be admissible to establish that fear if the prior conduct was either directed toward the victim (as in *Martin*, 940 S.W.2d 6), or was made known by the defendant to the victim in a manner reflecting an intent to heighten the victim's fear (as in *Wayman*, 926 S.W.2d 900). *See, e.g.*, *United States. v. Goodoak*, 836 F.2d 708, 713 (1st Cir. 1988) (holding that defendant's discussion with victim about his organized crime ties coupled with statement "[w]ell, then you know who I am then," was relevant to establish explanation for victim's later expressed fear in the face of defendant's attempted extortion); *United States v. Gigante*, 729 F.2d 78, 83-84 (2nd Cir. 1984) (holding that co-conspirator's reports to victim that other defendant was an organized crime member who had beaten other delinquent debtors was admissible to establish victim's believe that defendant would use extortionate means to collect debt); *United States v. Zappola*, 677 F.2d 264, 270 (2nd Cir. 1982) (holding that defendant's prior threats to victim's son "were calculated to convince [victims] that [defendant] was a 'tough guy' who wouldn't hesitate to use force to back up his demand for money); *United States v. Duhon*, 565 F.2d 345, 351 (5th Cir. 1978) (holding that acceptance of money was extortion and not a bribe where evidence established defendant's awareness of victim's knowledge of his criminal background, thus demonstrating an intent to exploit the fear generated by that knowledge).

20

Q:      Okay. *And when did you find that out*?

A:      *The day after he left*.

Q:      The day after he left your house?

A:      Um-hmm.

Q:      Let's talk about the day he left your house for just a minute; okay? On the day he left did he give you anything?

A:      He gave me a letter.

Q:      And did you read the letter?

A:      No, I gave it to my parents and they read it to me.

. . . .

Q:      Okay. *And then on the following day, you think you had another conversation with your parents*?

A:      *Yeah*.

Q:      *And you think that's when you found out that he was a registered sex offender*?

A:      *Yes*.

(Emphasis added.)  Though this testimony explains how the victim learned that Joyner was a registered sex offender, it does not establish Joyner's awareness of the victim's knowledge of his status.[15]  On this record, the victim's knowledge of Joyner's status was

---

[15]In the sidebar with the trial court during Joyner's counsel's initial objection and request for a mistrial, the trial court engaged in the following exchange with Joyner's trial counsel:
Q:      I'm assuming the defendant knew he was a registered sex offender?
A:      The defendant, yes.
Q:      And he would know that it was a bothersome issue to the girl?
A:      He did not tell the girl.  He told her parents.  The parents knew.  *I don't know that he would know that she would know.*
Thus, though it appears Joyner's counsel told the trial court that Joyner was the source of the parents' knowledge about his status, counsel confirmed that Joyner had no idea that the victim was aware of his status.

21

not a "circumstance" that was logically relevant to establish Joyner's purpose to harass through his course of conduct.[16] *Cf. People v. Uecker*, 91 Cal. Rptr. 3d 355, 367-68 (2009) (holding that evidence of stalking defendant's status as a registered sex offender was admissible to establish that victim was placed in reasonable fear for her safety where it could be inferred that he had this intent given his apparent knowledge that victim knew he was a registered sex offender).

We can discern no other legitimate basis for admission of the victim's testimony on this record.[17] It was thus an abuse of discretion for the trial court to admit the victim's testimony regarding Joyner's status as a registered sex offender as its only "logical relevance" was to establish Joyner's propensity to commit the crime with which he was

---

[16]It is also plain on this record that the trial court did not admit the victim's testimony for the purpose of establishing Joyner's purpose or intent to harass, and instead admitted the evidence for the reason that it believed the victim's state of mind to be relevant. In addressing Joyner's motion for new trial, which included several claims of error involving admission of the victim's testimony about Joyner's status as a registered sex offender, the trial court stated:

> Well, you filed a motion *in limine* addressing this stuff and I had got another Circuit Judge on the phone and talked about it. I mean this was in the mind of [the victim], and it went to show why certain acts -- I mean I think the prosecutor was showing, was trying to show that it went to show why certain acts were particularly alarming to [the victim], and you know, the fact that you have people on the sex offender registry because they had sex with their boyfriend or girlfriend at a certain age, I mean a lot of people are aware of that. And we just, together we didn't see, me and the other judge, we didn't see the prejudicial effect of it outweighing the probative value.

[17]To be clear, though we find no basis on this record to support admission of Joyner's status as a registered sex offender to establish "intent," we are not suggesting that Joyner's status could never have been admitted to establish one of the other recognized exceptions to the rule prohibiting evidence of uncharged crimes (*i.e.* mistake, motive, identity, or common scheme). However, there is no evidence in the record suggesting a logically relevant nexus between Joyner's status as a registered sex offender and any of these other exceptions. There is no suggestion of mistake in Joyner's actions toward the victim, no issue regarding his identity, no suggestion that his status as a registered sex offender demonstrated a common scheme, nor any indication that his status as a registered sex offender established his motive with regard to the actions toward the victim. This record is thus distinguishable from *State v. Still*, 216 S.W.3d 161, 270 (Mo. App. S.D. 2007) where the defendant opened the door to evidence of prior uncharged conduct he committed against the mother of his child victim by cross-examining the mother about her lack of cooperation with the police when the child victim reported the defendant's abuse. And this record is distinguishable from *State v. Coutee*, 879 S.W.2d 762, 767 (Mo. App. S.D. 1994) where a defendant stood accused of shooting and killing a black man under circumstances that appeared by the defendant's subsequent comments to be racially motivated. In light of that evidence, the Southern District found no plain error in admitting evidence of prior conduct establishing the defendant's racial animus as logically relevant to establish motive or intent. *Id.*

charged. Correspondingly, it was an abuse of discretion to deny Joyner's objection to the discussion of this testimony during closing argument. *McFadden*, 369 S.W.3d at 748.

### *The Erroneously Admitted Testimony Was Outcome Determinative*

Determining that the victim's testimony was erroneously admitted does not end our inquiry. An abuse of discretion in admitting evidence does not assure reversal of a conviction unless prejudice is demonstrated, established by proof that admission of the evidence was outcome determinative. *Adams*, 350 S.W.3d at 866. Our Supreme Court has explained that in assessing whether the improper admission of evidence was outcome determinative, "[t]he question is not . . . whether the state made a submissible case." *Barriner*, 34 S.W.3d at 151. Instead, "the question is whether the evidence had an effect on the jury's deliberations to the point that it ***contributed to the result reached***." *Id.* (emphasis added).

The Supreme Court has expressly rejected the assertion that improperly admitted evidence cannot be outcome determinative if other evidence of a defendant's guilt is overwhelming. *Id.* at 150 (holding in response to argument that evidence of guilt was overwhelming that "[t]his Court declines to utilize so narrow a test"). Instead, the Court has identified three factors it deems relevant to determining whether improperly admitted misconduct evidence is outcome determinative: (1) "the similarity of the charged offenses to the improperly admitted evidence"; (2) "[t]he amount of the evidence that was erroneously admitted and the extent to which the evidence was referred during the trial"; and (3) whether "the prosecutor's elicitation of the evidence that was erroneously

23

admitted was not inadvertent." *Id.* at 150-51 (citing Edward J. Imwinkelried, *Uncharged Misconduct Evidence* section 9.85 (rev. ed. 1999)).

After examining these three factors, we are left with the firm conviction that the victim's testimony regarding Joyner's status as a registered sex offender was outcome determinative. First, there is a relationship between the charged offense, aggravated stalking of a person of the age of 14 or younger, and the improperly admitted evidence of Joyner's status as a registered sex offender. Though the obligation to register as a sex offender is imposed for conduct that traverses a lengthy continuum of relative culpability, there can be little doubt about a jury's reaction to hearing that a defendant is a registered sex offender in a case involving the stalking of a minor. "The showing of prior sexual deviation is highly prejudicial to a person held to answer sexual charges[18] and even where an objection to such evidence is sustained, a cautionary instruction by the judge is of dubious value in erasing the suggestion from the jury's mind." *State v. Courter*, 793 S.W.2d 386, 388 (Mo. App. W.D. 1990) (citing *State v. Alexander*, 729 S.W.2d 467, 470 (Mo. banc 1986) (Blackmar, J., dissenting)).

Second, Joyner's status as a registered sex offender was repeatedly referred to at trial. We have already explained that the victim testified both before and immediately after Joyner's objection and request for a mistrial that she feared Joyner because he was a registered sex offender, and about how she came to learn of his status. During closing, the State argued:

---

[18]We realize a charge of aggravated stalking under section 565.225.3 is not necessarily a sex crime. However, when the offense is charged as aggravated stalking under section 565.225.3(4) because the victim is 17 years of age or younger and the defendant is 21 years of age or older, the overtone of a sexual offense cannot be ignored.

It's what would a reasonable 12 year old do when confronted with these actions by a person in the defendant's situation. . . . And I would tell you that it's clear to me, I hope that it's clear to you, that of course she would be distressed. She testified that she was scared. There's no reason to think that she wasn't. . . . And she testified that one of the reasons she was scared was she knew he was a registered sex offender. She knows that. You've got to take everything that she knows and think, now how would this make you feel?

The State thus repeatedly emphasized Joyner's status as a registered sex offender, compounding the likelihood that the evidence contributed to the jury's verdict. In fact, this record suggests that the victim's knowledge of Joyner's status as a registered sex offender may have been dispositive to the jury. On direct examination, the State specifically asked the victim:

> Q:    *Is that the only reason you were scared of him?*
>
> A:    *Yes*.

(Emphasis added.) On cross-examination, the victim confirmed the point:

> Q:    Okay. If your mom and dad hadn't told you anything about what [Joyner] said, or anything about what [Joyner] did, would you be scared of him?
>
> A:    Probably not.

Under these circumstances, we cannot disregard the effect of the victim's testimony about Joyner's status as a registered sex offender on the jury's decision to convict.

Third, the State's "elicitation of the evidence [about Joyner's status as a registered sex offender] was not inadvertent." *Barriner*, 34 S.W.3d at 151. Approximately two weeks before the August 9, 2013 trial, Joyner's counsel successfully secured *in limine* orders excluding evidence of Joyner's status as a registered sex offender and his

25

misdemeanor convictions related to that status. Joyner's motions *in limine* had argued that his status as a registered sex offender and his related misdemeanor convictions were logically and legally irrelevant propensity evidence. During the hearing on the motions *in limine*, the State argued that both categories of evidence went to Joyner's "motive in that it shows his attraction to girls." The trial court responded:

> That's normally the definition of propensity of the evidence. ***What we're looking for is, does this advance your case, rather than does it show that he has a propensity*** to commit these kinds of crimes?

(Emphasis added.) The State responded that the evidence "actually shows the reasoning, the absence of mistake as far as targeting this victim." The trial court pointed out that the case against Joyner was "not an absence of mistake situation, but it's a good try." The State then conceded: "Okay. Other than that I don't have any other issues with the motion." The trial court granted Joyner's motions *in limine* and ordered excluded from evidence at trial all references to Joyner's prior convictions and his status as a registered sex offender.

On August 2, 2013, seven days after the *in limine* orders were entered and seven days before trial, the State filed a second amended information which changed the alleged means by which Joyner violated section 565.225. The second amended information alleged that Joyner "repeatedly and purposely harassed [the victim] by following and communicating with her ***and thereby caused substantial emotional distress to [the victim]*** . . . ." (Emphasis added.) This new allegation tracked the definition of "harasses" found in section 565.225.1(3), RSMo 1994--language that was no longer a part of the statute.

At trial, the State elicited the victim's testimony about Joyner's status as a registered sex offender. When Joyner objected and requested a mistrial, the State did not express surprise over the victim's testimony, though the testimony violated the *in limine* orders.[19] Rather, the State argued that the victim's subjective knowledge was logically relevant to establish the victim's emotional distress--an argument tied, no doubt, to the language added in the second amended information.[20] The trial court, with no mention of its *in limine* orders, overruled Joyner's objection and request for a mistrial.[21]

We are left pondering whether the second amended information's reference to an antiquated version of section 565.225 was an honest mistake or a calculated effort to maneuver a way around the *in limine* orders. Regardless the explanation, the result is the same. The State's admission of the victim's testimony about Joyner's status as a registered sex offender was not inadvertent.

The outcome determinative factors identified in *Barriner* persuade us that evidence of Joyner's status as a registered sex offender "had an effect on the jury's

---

[19]On this point, we note that the standard for determining whether prejudice results from inadmissible *uninvited* testimony regarding other crimes is slightly different. In such cases, we consider:

> 1) Whether the statement was, in fact, voluntary and unresponsive to the prosecutor's questioning or caused by the prosecutor; 2) whether the statement was singular and isolated, and whether it was emphasized or magnified by the prosecution; 3) whether the remarks were vague and indefinite, or whether they made specific reference to crimes committed by the accused; 4) whether the court promptly sustained defense counsel's objection to the statement, and instructed the jury to disregard the volunteered statement; and 5) whether, in view of the other evidence presented and the strength of the State's case, it appeared that the comment played a decisive role in the determination of guilt.

*State v. Goff*, 129 S.W.3d 857, 866 n.7 (Mo. banc 2004). Because the victim's testimony regarding her knowledge of Joyner's status as a registered sex offender was clearly elicited by the State and is not argued by the State to have been uninvited, this standard is not applicable.

[20]By their very nature, *in limine* orders are interlocutory. *State v. Purlee*, 839 S.W.2d 584, 592 (Mo. banc 1992) ("A ruling in limine is interlocutory only and subject to change during the course of trial."). Thus, notwithstanding the *in limine* orders, the State remained free to explore other legitimate means by which Joyner's status as a registered sex offender could be introduced into evidence at trial, and the trial court remained free to change its mind about the admission of such evidence at trial.

[21]*See* supra notes 16 and 20.

deliberations to the point that it ***contributed to the result reached***." *Barriner*, 34 S.W.3d at 151 (emphasis added).

Joyner's first and second points on appeal are granted. The trial court's judgment of conviction and sentence is reversed and this matter is remanded for a new trial.

## Point Five

Though resolution of Joyner's first and second points on appeal negates the need to determine Joyner's remaining points on appeal, in the interest of judicial economy, and because the same issue is likely to arise on retrial,[22] we briefly comment on Joyner's fifth point on appeal. Joyner argues that the trial court erred in giving the jury a verdict director that failed to define "harassing" and "course of conduct" as required by MAI-CR 319.42(3).

The verdict director, Instruction 5, was modeled after MAI-CR 319.42(3). However, it omitted the last three paragraphs required by the approved instruction.[23] Those paragraphs state:

> However, unless you find and believe from the evidence beyond a reasonable doubt each and all of these propositions, you must find the defendant not guilty of that offense.

> As used in this instruction, the term "harassing" means to engage in a course of conduct directed at a specific person that serves no legitimate purpose, and that would cause a reasonable person under the circumstances to be frightened, intimidated, or emotionally distressed.

---

[22]Joyner's remaining points on appeal address matters involving the admission of evidence and/or the sufficiency of the evidence that will be influenced by the state of the record if the issues arise again during retrial. *See supra* note 4. Thus, resolution of these points here would not necessarily be controlling on remand.

[23]Joyner does not complain on appeal about the omission of the first of these three paragraphs. However, all three omitted paragraphs are required, and should be a part of any instruction submitted to the jury on retrial.

> As used in this instruction, the term "course of conduct" means a pattern of conduct composed of two or more acts, which may include communication by any means, over a period of time, however short, evidencing a continuity of purpose. (The phrase "course of conduct" does not include [*Insert facts that, if believed, would establish that defendant was engaged in constitutionally protected activity, such as picketing or other organized activity.*])

Rule 28.02 governs the use of instructions and verdict forms in a criminal trial. Rule 28.02(c) requires the trial court to give the appropriate approved instructions or verdict form to the exclusion of any other instruction or verdict form. Failure to follow the MAI-CR form or applicable Notes on Use "shall constitute error, the error's prejudicial effect to be judicially determined." Rule 28.02(f).

Though we express no opinion as to whether, on this record, prejudicial error arose from use of a verdict director that failed to conform to MAI-CR 319.42(3),[24] this potential source of error can be avoided during retrial.[25]

---

[24]Joyner failed to object that the required definitions were omitted from the verdict director at trial; arguably waived any right to seek even plain error review of this error by affirmatively expressing that he had no objection to the form of the verdict director; may have negated (at least in part) the prejudicial effect of the omitted definition of "harasses" by submitting a converse instruction that supplied the jury with a portion of the definition; and may have invited error by using the phrase "course of conduct" in the tendered converse instruction without defining the term.

[25]Though not raised by Joyner, we have some question about paragraph third in MAI-CR 319.42(3) which tenders as an essential element for "course of conduct" stalking that "such harassment would cause a reasonable person under the circumstances to be frightened, intimidated, or emotionally distressed." *See also* MAI-CR 319.42(4). This same "essential element" does not appear in MAI-CR 319.42(1) or (2), both of which address aggravated stalking by "following." We realize that "course of conduct" stalking requires proof that the defendant "purposely harasses," while "following" stalking requires proof only of the "intent to harass." However, these differing *mens rea* requirements are already appropriately instructed in paragraph first of each of the four possible aggravated stalking verdict directors. *See* MAI-CR 319.42 (1), (2), (3), and (4). And in each case, the word "harasses" is a required definition. Thus, it seems that by reference solely to paragraph first of each verdict director, and to the required definition of "harasses," a jury is instructed to determine whether a defendant "purposely harassed"--that is purposely engaged in conduct that would cause a reasonable person to feel frightened, intimidated, or emotionally distressed--or "followed with the intent to harass"--that is followed with the intent to engage in conduct that would cause a reasonable person to feel frightened, intimidated, or emotionally distressed. The repetition of a part of the definition of "harasses" as a separate essential element to be found by the jury in versions of MAI-CR 319.42 addressing "course of conduct" stalking seems confusing and has the potential effect of decoupling the effect of a conduct from the requisite *mens rea*. We observe in making this point that even though the definition of "harasses" has always contained essentially the same "reasonable person" language, MAI-CR 319.42(3) and (4) *did not* include what now appears as paragraph third prior to the legislature's amendment of the

29

## Conclusion

The trial court's judgment of conviction and sentence is reversed. This matter is remanded for a new trial.

_Cynthia L. Martin_
Cynthia L. Martin, Judge

All concur

---

definition of "harasses" in 2008. We fail to see how the legislature's elimination in 2008 of the State's obligation to establish an "in fact" effect of substantial emotional distress on a victim suddenly remaining "reasonable person" component of the definition of "harasses" into an essential element to be instructed separately from that definition of that term. Though we do not resolve this question here, it is tendered to the MAI-CR criminal instructions committee for consideration.