**STATE of Missouri, Respondent,**

v.

**Shon A. SIGMON, Appellant.**

**No. ED 104056**

Missouri Court of Appeals,
Eastern District,
**DIVISION FOUR.**

FILED: April 25, 2017

Margaret M. Johnston, St. Louis, MO, for appellant.

Joshua D. Hawley, Colette Neuner, Jefferson City, MO, for respondent.

## Introduction

KURT S. ODENWALD, Judge

Shon A. Sigmon ("Sigmon") appeals from the judgment of the trial court following a jury trial convicting him on three counts of second-degree assault of a law enforcement officer, one count of third-degree assault of a law enforcement officer, one count of aggravated stalking, and one count of second-degree sexual misconduct. On appeal, Sigmon challenges the sufficiency of the evidence to support his convictions for aggravated stalking and sexual-misconduct.

Although the State presented evidence that Sigmon was verbally abusive and taunted the arresting law enforcement officers during his arrest and transport to the county jail, such conduct did not establish the course of conduct required to prove aggravated stalking. Further, the abusive and lewd taunts and threats made regarding the daughter of one of the arresting officers did not meet the evidentiary requirements of solicitation necessary to convict Sigmon of sexual misconduct. Accordingly, we reverse Sigmon's convictions for aggravated stalking and sexual-misconduct and vacate the corresponding sentences. The judgment is affirmed in all other respects.

## Factual and Procedural History

Following an aggressive turbulent encounter with law enforcement, the State charged Sigmon with four counts of second-degree assault of a law enforcement officer, one count of aggravated stalking, one count of second-degree sexual misconduct, and one count of escape from confinement. The case proceeded to a jury trial.

At trial, Officer Travis Stafford ("Officer Stafford") and Officer Garry Brady ("Officer Brady"), both of the Stoddard County Sheriff's Department, testified that they had received a call to assist at the scene of a domestic disturbance. Officers Stafford and Brady responded to the call to provide backup to the investigating officer. Officer Stafford recalled that Sigmon was among six to eight people in the front yard of the home and that many of them, including Sigmon, were intoxicated. Officer Stafford recognized Sigmon, as Officer Stafford lived nearby and had previously encountered him in the area. Officer Stafford had no previous problems with Sigmon.

During the domestic-disturbance investigation, an agitated and clearly intoxicated Sigmon was stumbling around without any coordination and was "running his mouth." According to the officers, Sigmon alternated between talking calmly and screaming. Sigmon repeatedly threatened to kill everyone at the scene.

After intermittently yelling threats, Sigmon turned towards Officers Stafford and Brady and pointed at them. According to Officer Stafford, Sigmon screamed, "You fucking—. I'm going to kill you." Sigmon then quickly walked towards the officers while raising his closed fist. Officer Stafford raised his hands and shouted at Sigmon to stop. Sigmon continued towards the officers with his fist cocked back. Believing he was about to be struck, Officer Stafford wrestled Sigmon to the ground.

While pinned, Sigmon attempted to strike Officer Stafford. Officer Stafford handcuffed Sigmon with assistance from Officer Brady. The officers testified that Sigmon then called Officer Stafford "a dead man walking" and threatened to beat him. The officers forced an uncooperative Sigmon into the patrol car. Officers Stafford and Brady testified that they were on the scene from between thirty minutes to a little more than an hour.

Upon placing Sigmon in the patrol car, Officers Stafford and Brady began transporting Sigmon to the county jail "right shortly" thereafter. The county jail was located approximately twenty to thirty minutes away. As they began the drive, the officers testified that Sigmon leaned forward and threatened Officer Stafford about the safety of his daughter. Officer Stafford had a young daughter with blonde hair. According to Officer Stafford, Sigmon warned, "I know you. You know I do. I know you've got a pretty little blonde girl that plays outside." Stating that he has seen Officer Stafford's daughter playing in the officer's yard, Sigmon continued, "I'm going to enjoy taking her and covering her up and watching her scream and struggle while I get off on her." Officer Brady specifically recalled Sigmon threatening Officer Stafford: "Hope you talked to your daughter tonight. I'm only going to be here 24 hours. When I get out, you'll never see her again." According to Officer Brady, Sigmon also said that he liked pretty little girls, that he would handcuff Officer Stafford's daughter, and that he would come back to make her disappear. Officer Brady testified that Sigmon made these threats while "making little smirky laughs" as though the officers had "messed with the wrong person."

Officer Stafford became furious, parked and exited the patrol car, and prepared to confront Sigmon. Officer Brady believed that Officer Stafford stopped the car to confront Sigmon within 7 to 8 minutes of starting the drive. Officer Brady testified that Sigmon was shouting, "Let's do this. Let's do this." However, Officer Brady persuaded Officer Stafford to get back into the car and to continue driving. Officer Stafford collected himself and resumed the drive. As the drive continued, Sigmon admitted that he wanted to get hit so that he could sue Officer Stafford.

After Sigmon arrived at the jail, Zach Mitchell ("Mitchell")[1] testified that Sigmon was angry, belligerent, and out of control. Sigmon threatened the processing corrections officers as they placed him in a padded cell. About thirty to forty minutes later, Sigmon began digging at the padded cell with a ring, causing damage to the structure. Mitchell and Officer Christopher Cross ("Officer Cross") approached the cell and opened the door to confiscate Sigmon's ring. Mitchell testified that Sigmon "came flying out" and tried to hit them. Officer Cross tased Sigmon, causing Sigmon to fall to the ground. Sigmon was asked if he was going to stop. Despite indicating that he was done, Sigmon started to rise, and Officer Cross tased him again. A subdued Sigmon was dragged back to the padded cell.

Sigmon testified in his own defense. Sigmon knew Officer Stafford from around town, but said he did not know that Officer Stafford had a daughter. Sigmon remembered that, on the night in question, he had consumed at least one bottle of tequila and was heavily intoxicated. Sigmon recalled that police officers arrived at the residence and that he "snapped" when Officer Stafford told Sigmon, "You won't see your fucking daughter again." Sigmon had an ongoing custody case involving his

---

1. At the time of the incident, Zach Mitchell was a corrections officer.

daughter; Officers Stafford and Brady may have accompanied past caseworkers to Sigmon's residence. Sigmon had no further recollection of that night; he did not remember assaulting the officers and had no memory of the transport to the jail. Sigmon's mother also testified, stating that Officer Stafford had threatened to prevent Sigmon from seeing Sigmon's daughter again.

Sigmon moved for judgment of acquittal at the close of all evidence, and the trial court denied that motion. The jury found Sigmon guilty on three counts of second-degree assault, one count of third-degree assault, one count of aggravated stalking, and one count of sexual misconduct. The jury acquitted Sigmon of escaping from confinement.

The jury recommended sentences of four years in prison each for assaulting and stalking Officer Stafford. The jury further recommended three years in prison for both of the remaining counts of second-degree assault, one year in jail for third-degree assault, and fifteen days in jail for sexual misconduct. The trial court sentenced Sigmon according to the jury's recommendations. The trial court ran the two four-year sentences consecutively. The other sentences were to run concurrently for a total of eight years in prison. This appeal follows.

## Points on Appeal

Sigmon presents two points on appeal. First, Sigmon argues that insufficient evidence supported his conviction for aggravated stalking because the State lacked evidence of a harassing course of conduct. Second, Sigmon avers that there was insufficient evidence to support his sexual-misconduct conviction, as there was no evidence that Sigmon solicited or requested to engage in sexual conduct with Officer Stafford's daughter.

## Standard of Review

"Appellate review of sufficiency of the evidence is limited to whether the [S]tate has introduced sufficient evidence from which a reasonable juror could have found each element of the crime beyond a reasonable doubt." State v. Hosier, 454 S.W.3d 883, 898 (Mo. banc 2015). In reviewing the evidence, this Court "considers all evidence in the light most favorable to the verdict and grants the State all reasonable inferences." State v. Lammers, 479 S.W.3d 624, 632 (Mo. banc 2016). This Court "disregards contrary inferences, unless they are such a natural and logical extension of the evidence that a reasonable juror would be unable to disregard them." State v. Langdon, 110 S.W.3d 807, 811 (Mo. banc 2003) (quoting State v. Grim, 854 S.W.2d 403, 411 (Mo. banc 1993)). We may not supply missing evidence or give the State the benefit of unreasonable, speculative, or forced inferences. Lammers, 479 S.W.3d at 632.

The State has the burden to offer sufficient evidence " 'to prove each and every element of a criminal case' beyond a reasonable doubt." State v. Burnett, 492 S.W.3d 646, 650 (Mo. App. E.D. 2016) (quoting State v. Jordan, 181 S.W.3d 588, 592 (Mo. App. E.D. 2005)). "If the State fails to meet its burden, we must reverse the trial court's judgment." Id.

## Discussion

### I. Point One—Aggravated Stalking

Sigmon was convicted for the aggravated stalking of Officer Stafford in violation of Section 565.225.[2] Under Section 565.225.3, as defined at the time of the

**2.** All statutory references are to RSMo Cum. Supp. (2013), unless otherwise stated.

offense, a person commits the crime of aggravated stalking "if he or she purposely, through his or her course of conduct, harasses or follows with the intent of harassing another person, and: (1) Makes a credible threat[.]" Section 565.225.1(1) defined "course of conduct," in part, as "a pattern of conduct composed of two or more acts, which may include communication by any means, over a period of time, however short, evidencing a continuity of purpose." A "credible threat" was "a threat communicated with the intent to cause the person who is the target of the threat to reasonably fear for his or her safety, or the safety of his or her family .... The threat must be against the life of, or a threat to cause physical injury to, or the kidnapping of, the person, the person's family, or the person's household members ...." Section 565.225.1(2). Finally, Section 565.225.1(3) defined "harasses" as "to engage in a course of conduct directed at a specific person that serves no legitimate purpose, that would cause a reasonable person under the circumstances to be frightened, intimidated, or emotionally distressed."

■ To convict Sigmon of aggravating stalking as charged, the State had to establish that Sigmon purposefully harassed Officer Stafford as part of a course of conduct and that, during this course of conduct, he made at least one credible threat. See State v. Starkey, 380 S.W.3d 636, 643 (Mo. App. E.D. 2012). On appeal, Sigmon maintains that his actions towards Officer Stafford during their sole encounter did not meet the threshold for establishing the "course of conduct" required for a conviction of aggravated stalking, citing State v. Mabry, 285 S.W.3d 780 (Mo. App. E.D. 2009). The State counters that the multiple threats made by Sigmon during his arrest and transport to the county jail were separate acts evidencing a conti-

nuity in purpose in harassing Officer Stafford and satisfy the requirements of "course of conduct," citing State v. Bernhardt, 338 S.W.3d 830 (Mo. App. E.D. 2011).

In Mabry, the victim received four anonymous and threatening letters that she believed were sent by the defendant. 285 S.W.3d at 784. The victim also encountered the defendant twice while driving on public roads. Id. The first incident occurred when the defendant pulled up next to the victim at a red light and yelled at her. Id. The second incident occurred a few months later when the defendant swerved his car at the victim, nearly hitting her car. Id. at 784–85. The State charged Mabry with stalking for "repeatedly and purposefully harass[ing] the victim by yelling at her." Id. at 788. Determining that Section 565.225, "clearly requires that a person commit *more than one* act of harassment towards a victim to be found guilty of criminal stalking[,]" our Court noted that the defendant was charged with stalking by repeatedly yelling at the victim, but that the evidence supported only one instance of yelling: the red light incident. Id. at 788–89. We stated that the plain meaning of yelling precluded our consideration of the defendant's other conduct in determining whether or not he harassed the victim through yelling as charged by the State, and the one instance of yelling did not constitute a course of conduct. Id. at 789. We reversed the defendant's conviction for stalking. Id.

In Bernhardt, the defendant had been a patient of the victim. 338 S.W.3d at 831. The defendant told his father that he was going to the victim's house to kill the victim. Id. The defendant's father warned the victim. Id. Years later, at 3:00 a.m., the defendant drove to the victim's house in possession of a firearm. Id. The victim's son saw the defendant stop the car approx-

imately 20 to 25 feet from the house and begin shifting the car between reverse and drive as if to parallel park. Id. After a minute or two, the defendant drove away. Id. The defendant returned a few minutes later. Id. at 831–32. The defendant remained in his car for about five minutes, and again drove away. Id. at 832. Ten minutes later, the defendant again returned to the victim's house in his car and began loading a gun. Id. The victim's son called security and security chased the defendant from the scene. Id. Around 90 minutes later, the defendant returned a third time to the victim's house. Id. The defendant exited and entered his car three or four times while carrying the gun. Id. When the defendant left the scene, he was stopped by security and arrested. Id. The defendant was convicted at trial of aggravated stalking. Id.

On appeal, the defendant in Bernhardt challenged the sufficiency of his aggravated-stalking conviction by arguing the absence of evidence permitting an inference that he intended to communicate a threat to the victim. Id. at 833–34. We determined that a credible threat may be delivered via an intermediary (victim's son) and that stalking does not require the threat be communicated directly to the victim. Id. at 834. We further found that there was sufficient evidence to demonstrate that the defendant's conduct was designed to cause fear as the defendant repeatedly appeared in front of the victim's house, the defendant visibly brandished a gun, and the defendant stepped out of the car armed with a gun in close proximity to the victim's house. Id. at 834–35.

Contrary to the State's suggestion, Bernhardt does not control our decision here. Importantly, in Bernhardt we did not address the issue of whether the several appearances of the defendant over the course of the early morning hours were separate acts that could support a finding of a course of conduct under the statute. Further, the facts in Bernhardt are significantly distinguishable from the facts before us. The defendant in Bernhardt voluntarily appeared at the victim's house four separate times over the course of a night. Id. at 831–32. After brandishing a gun and being chased away by security, Bernhardt *returned* to the house 90 minutes later and again displayed a gun in a threatening manner in front of the victim's house. Id. at 832. The different threats and appearances by defendant at victim's house were separated by both time and space. The defendant physically retreated from the scene and elected to return at a later time to repeat the threat. In contrast, Sigmon was engaged in one continuous interaction with Officer Stafford, similar to the sole confrontation that occurred in Mabry. Further, all the charged threats happened within a very short period of time, as Sigmon was detained by the officers and not free to leave the scene.

We find scant caselaw guiding our analysis of what actions constitute a course of conduct in the context of criminal stalking. Accordingly, we find it helpful to review cases interpreting a similar course-of-conduct requirement under the Missouri Adult Abuse Act, Sections 455.010 through 455.090, which provides, in part, civil relief and protection for victims of stalking. See Section 455.020 RSMo Supp. (2015). Under the Missouri Adult Abuse Act, a person commits stalking when he or she "purposely engages in an unwanted course of conduct that causes alarm to another person, ... when it is reasonable in that person's situation to have been alarmed by the conduct." M.N.M. v. S.R.B., 499 S.W.3d 383, 384 (Mo. App. E.D. 2016) (quoting Section 455.010 RSMo Supp. (2015)). In analyzing the requirement of course of conduct, we find M.S. v. N.M., 485 S.W.3d 792 (Mo. App. E.D. 2016), and M.L.G. v. R.W., 406

S.W.3d 115 (Mo. App. E.D. 2013), useful. Course of conduct is currently described in the Missouri Adult Abuse Act, in part, as "a pattern of conduct composed of two or more acts over a period of time, however short, that serves no legitimate purpose." M.N.M., 499 S.W.3d at 385 (quoting Section 455.010 RSMo Supp. (2015)). However, M.S. and M.L.G. interpreted a prior definition which described course of conduct as "a pattern of conduct composed of repeated acts over a period of time, however short, that serves no legitimate purpose[.]" M.S., 485 S.W.3d at 794–95 (citing Section 455.010(13)(b)). The term "repeated" was further explained as "two or more incidents evidencing a continuity of purpose." Id. (citing Section 455.010(13)(c)); M.L.G., 406 S.W.3d at 117. We find the course-of-conduct requirement for criminal stalking to be substantially similar to the course-of-conduct requirement used in the Missouri Adult Abuse Act.

In M.S., the defendant worked as a coach in a baseball league run by the petitioner. 485 S.W.3d at 793. During a summer meeting called by the petitioner to discuss the defendant's coaching style, the defendant screamed and hollered at the meeting's other attendees, including the petitioner. Id. at 793–94. Nearly three years later and upset by the petitioner's management of the league, the defendant called the petitioner and, during the course of the phone call, threatened to "cut [the petitioner's] head off, break [the petitioner's] knees, put his boot down [the petitioner's] throat, and knock [the petitioner's] dentures out." Id. at 794. The trial granted an order of protection, finding that the defendant had stalked the petitioner. Id. We reversed. Id. at 796.

In reversing the finding of stalking, we first found no continuity of purpose between the two separate communications as the first encounter did not cause alarm to the petitioner, the petitioner initiated the first encounter, and there was no connection between the two communications. Id. at 795. Second, and more critical to our analysis, we held that the separate threats communicated by the defendant during the course of the one phone call, while alarming, constituted only one incident under the Missouri Adult Abuse Act. Id. at 796. Specifically, we noted that "[a] single event causing alarm is insufficient to prove stalking because of the absence of repeated acts over a period of time." Id. at 796.

In M.L.G., the petitioner went to the defendant's property to discuss and resolve a neighborhood dispute. 406 S.W.3d at 116–17. The discussion turned violent, with the defendant brandishing a gun. Id. at 117. The defendant threatened to kill the petitioner. Id. The defendant then placed his gun on the petitioner's temple. Id. The trial court found that these two acts—the verbal threats and the physical act of placing the gun on the petitioner—evidenced a repeated course of conduct. Id. at 118. On appeal, we found that this violent encounter constituted a single altercation, and we held that the trial court misapplied the law when it created two incidents from this single altercation. Id. Because a single incident is insufficient to support an order of protection against the defendant for stalking, we reversed. Id.

Here, Sigmon's statements of "You fucking—. I'll kill you[,]" that Officer Stafford was "a dead man walking[,]" and that he would beat Officer Stafford, all occurred during his physical assault of Officer Stafford. Cf. M.L.G., 406 S.W.3d at 117–18. Sigmon was immediately arrested and placed in a police car. Sigmon was transported to jail "right shortly" thereafter. Sigmon's threats against the daughter infuriated Officer Stafford enough that, according to Officer Brady, Officer Stafford

stopped to confront Sigmon *within the first 7–8 minutes* of the drive. The record shows that the statements threatening Officer Stafford and the daughter were made in the immediate aftermath of Sigmon*'s assaultive encounter with Officer Stafford, with no meaningful physical separation occurring between Officer Stafford and Sigmon. Cf. M.L.G., 406 S.W.3d at 117–18. The record reveals no significant separation in time or space from which Sigmon could reflect on his behavior. Indeed, Sigmon's threats occurred in the heat of the moment during the incident of Sigmon's arrest and transport to jail. We are not persuaded that Sigmon's harassing statements were uttered as a course of conduct rather than in a singular occurrence. It is not disputed that Section 565.225 requires more than one instance of harassment towards a victim to support a stalking conviction. See Mabry, 285 S.W.3d at 788.

Unquestionably, Sigmon's threats were vile and aggressive. We note that Sigmon's conduct rightfully resulted in multiple convictions and prison time for assaulting law enforcement officers. But, without any meaningful separation of space and time between Sigmon's actions directed toward Office Stafford, we are unwilling to conclude that each threat Sigmon made during the encounter constituted a separate and distinct act. Cf. M.S., 485 S.W.3d at 796 (finding that separate threats communicated during the same conversation were not separate, repeated acts over a period of time). Because Sigmon's threats, however deplorable, are not lawfully divisible into separate acts demonstrating a continued course of conduct, those threats alone are not sufficient to support an aggravated-stalking conviction. Sigmon's first point is granted.

## II. Point Two—Second–Degree Sexual Misconduct

 Sigmon also challenges the sufficiency of the evidence to support his conviction for sexual-misconduct in violation of Section 566.095. Under Section 566.095, a person commits second-degree sexual misconduct "if he or she solicits or requests another person to engage in sexual conduct under circumstances in which he or she knows that such a request or solicitation is likely to cause affront or alarm." Sigmon argues that he never solicited Officer Stafford for sexual contact with Officer Stafford's daughter. We agree.

 A solicitation or a request to engage in sexual conduct involves asking or petitioning another person to participate in or perform sexual acts. See State v. Moore, 90 S.W.3d 64, 68–69 (Mo. banc 2002) (upholding conviction under Section 566.095 when a 61–year-old man asked a 13–year-old girl to participate in oral sex); State v. Sears, 298 S.W.3d 561, 565 (Mo. App. E.D. 2009) (defining "solicit" as "to make petition to," or "to urge (as one's cause) strongly."). A sexual solicitation does not require a defendant to use magic words, and a defendant need not explicitly ask the victim for sexual contact. See Sears, 298 S.W.3d at 565; State v. Gouvion, 732 S.W.2d 577, 579 (Mo. App. W.D. 1987). Further, a solicitation or request for sexual contact may be inferred from the entire circumstances surrounding the defendant's behavior and conduct. See Sears, 298 S.W.3d at 565.

Despite the reprehensibility of Sigmon's threats regarding Officer Stafford's daughter, these threats simply do not support a finding that Sigmon was soliciting or requesting to have sexual contact with Officer Stafford's daughter. See State v. Roden, 674 S.W.2d 50, 55 (Mo. App. W.D. 1984) (evidence that a defendant intended to have sexual intercourse by forcible compulsion was deemed a threat to rape the victim, and not an attempt to solicit the

victim to engage in sexual intercourse). Without question, Sigmon's comments were sexual in nature—aggressively so. However, it subverts the plain and usual meaning of the words used by Sigmon to suggest that Sigmon was proposing, inviting, or otherwise requesting to engage in sexual conduct with Officer Stafford's daughter. To the contrary, Sigmon's comments were threatening and provocative in nature. Sigmon's words contain no hint or suggestion of a request, or of seeking permission or consent from Officer Stafford. While on the way to jail, Sigmon threatened to kidnap, "get off on," and possibly murder Officer Stafford's daughter. Sigmon made these threats to a known police officer who had just arrested him after a hostile, physical altercation. It is disingenuous to suggest that Sigmon's threatening and antagonistic conduct towards the officers was an effort to petition Officer Stafford or his daughter to perform sexual acts. Under the very clear and uncontradicted facts in the record, there is simply no evidence from which the jury could reasonably infer that Sigmon was soliciting or requesting to engage in impermissible and unlawful sexual conduct with the officer's daughter.

While Sigmon's comments were offensive and likely to cause alarm or affront, and perhaps prosecution under a different statute, no solicitation for sexual conduct—as required by Section 566.095—occurred during the confrontation. While we can understand how Sigmon's comments could provoke an aggressive response, we cannot validate the apparent overcharging of Sigmon on this count. We do not condone Sigmon's obscene, explicit, and vulgar behavior. We are repulsed by his conduct. However, Sigmon's threats against Officer Stafford simply do not constitute the crime of sexual misconduct in the second degree with the corresponding requirement to register as a sex offender. See Moore, 90

S.W.3d at 69 (citing Section 589.400). Sigmon's second point is granted.

## Conclusion

The judgment of the trial court is affirmed in part and reversed in part. We reverse Sigmon's convictions for aggravated stalking and sexual misconduct, and we vacate the corresponding sentences. We affirm all other aspects of the judgment and sentences.

James M. Dowd, P.J., concurs.

## DISSENT

Gary M. Gaertner, Jr., J.

I respectfully dissent in part. Because I believe the element of a course of conduct involving two or more acts is present when viewing the evidence in the light most favorable to the conviction for aggravated stalking, I would affirm the judgment in this respect.

It is undisputed that Defendant's actions toward Officer Stafford constituted harassment, but as the majority notes, to be convicted of aggravated stalking, Defendant must have committed more than one act of harassment toward Officer Stafford. State v. Mabry, 285 S.W.3d 780, 788 (Mo. App. E.D. 2009). Specifically, the issue here is whether there was sufficient evidence in the record from which a reasonable trier of fact could conclude beyond a reasonable doubt that Defendant engaged in "a pattern of conduct composed of two or more acts, which may include communication by any means, over a period of time, *however short*, evidencing a continuity of purpose." Section 565.225.1(1), RSMo. (Supp. 2013) (emphasis added); State v. Vandevere, 175 S.W.3d 107, 108 (Mo. banc 2005) (standard of review for sufficiency of evidence).

I emphasize the phrase "however short" from the statute because it is particularly relevant in this case, where the entire encounter between Defendant and Officer Stafford took place over about an hour and a half. The statute plainly contemplates that multiple acts of harassment can occur in a short period of time. Therefore, the passage of time is not the salient issue; the gravamen is whether there is any evidence of separation between the acts of harassment in the record, "however short."

I agree with the majority that case law is scant on this exact issue, but the facts in existing case law address situations falling in either one of two extremes. First, there are cases with sufficient evidence of two or more acts, where the incidents are separated by date, or where they occur on the same day but are separated in time by the defendant breaking contact with the victim and then re-establishing it. Eg., State v. Bernhardt, 338 S.W.3d 830 (Mo. App. E.D. 2011) (affirmed on other grounds; defendant drove to victim's house four separate times over course of one night); State v. McCauley, 317 S.W.3d 132 (Mo. App. S.D. 2010) (defendant called victim numerous times over course of four days, each separated by period of time in which defendant had opportunity to reconsider his actions); State v. Lasley, 130 S.W.3d 15 (Mo. App. E.D. 2004) (defendant left multiple separate threatening phone messages on victim's answering machine). Clearly Defendant's case is not similar to these, in that he and Officer Stafford were in each other's presence for the entire encounter.

Second, the facts of cases reversing for insufficient evidence, relied on by the majority, tend to fall at the other extreme, where there is a single, continuous conversation, during which the defendant makes multiple verbal or physical threats. E.g., Mabry, 285 S.W.3d at 788–89 (charging document said defendant harassed victim

by "yelling" at her but only one instance of yelling during one encounter in evidence); M.S. v. N.M., 485 S.W.3d 792 (Mo. App. E.D. 2016) (multiple threats during course of one phone call); M.L.G. v. R.W., 406 S.W.3d 115 (during continuous argument defendant threatened to kill victim, pulled out gun, and placed gun on temple of victim).

Our case is also distinguishable from this extreme. Viewing the evidence in the light most favorable to the verdict, as we must under the standard of review, the record does not support a finding that this was one continuous conversation as found in M.S. and M.L.G. The evidence was that Defendant's threats began when he charged toward Officer Stafford. The majority notes that Defendant's statements that he was going to beat and kill Officer Stafford "all occurred during his physical assault of Officer Stafford." The majority continues that Defendant was then "immediately arrested and placed in a police car" and "transported to jail 'right shortly' thereafter." It was during the car ride to jail that Defendant turned to threats against Officer Stafford's daughter.

While the majority finds this one continuing conversation, I disagree. I would even suggest using the majority's own words, that the time period described as "right shortly thereafter" between placing Defendant in the police car and then Defendant making threats against Officer Stafford's daughter is a sufficient separation of time between acts under the "however short" designation of the statute, but there is more in the record showing such separation. Though the officers did immediately arrest Defendant while he was on the ground, placing Defendant in the police car was not so immediate. The record contains testimony that Defendant refused to walk and had to be dragged to the police car. During this time, Defendant was

laughing and saying "[w]ee, wee," apparently finding the situation funny. Once Officer Stafford and Officer Brady had placed Defendant into the police car, there was evidence that Officer Brady then moved his own police car to the Puxico police station, about one block away, to leave it there while both officers drove Defendant to the county jail in Bloomfield in Officer Stafford's police car. When Officer Brady returned from parking his car, he entered Officer Stafford's police car, and they began driving. At some point while they were driving, Defendant began threatening Officer Stafford's daughter.

Thus, between Defendant's separate and distinct threats to kill Officer Stafford and later threats directed toward Officer Stafford's daughter, time passed while the officers dragged Defendant to the police car, and then Defendant waited in the police car while Officer Brady moved his own vehicle about a block away, and then walked back to Officer Stafford's car. During this time there is no evidence Defendant's threats continued or that he and Officer Stafford were conversing. Given this period of time in between Defendant's separate and distinct threats, I disagree with the majority's conclusion that the record "reveals no significant separation in time or space from which [Defendant] could reflect on his behavior." I believe he had time to reflect on his first series of threats to Officer Stafford while gleefully enjoying being dragged to the police car and while sitting there waiting for Officer Brady to move his car, before commencing his next series of threats against Officer Stafford's daughter. Though such time was admittedly short, I would find it sufficient under the statute's language that a course of conduct can occur "over a period of time, however short." Section 565.220.1(1), RSMo. (Supp. 2013).

Thus, viewing the evidence in the light most favorable to the verdict, I would find that the record contains sufficient evidence from which a reasonable trier of fact could find Defendant committed two separate and distinct acts of harassment beyond a reasonable doubt. I would therefore affirm Defendant's conviction for aggravated stalking. For the foregoing reasons, I respectfully dissent in part.