On August 26, 2014, at 5:28 p.m., A.L. received a series of text messages from the *414 number (904) 373-9763. A.L. testified that, while she did not recognize the phone number, the content of the messages indicated that the messages were from Graham. The text conversation read:[3]
Graham: Hi
A.L.: Who is this
Graham: lied to you, I have a recording of her admitting it. Roderick listen to the recording ask
Graham: Robin Hood. I'm not trying to reconcile or contact you or anything. Just trying to get some normalcy back into my life, what's left of it. My mom trick and
Graham: him what he heard my Mom say about you I'm not trying to undermine you and force your family on me.
Graham: Just looking for peace and happiness. Your things have been return Roderick has them. Never planned on keeping them
Graham: Not trying to be in your life, but I will never break my promise to take care of u, u know I paid some bills last month, I gave u things back, I haven't
Graham: bothered u. I just want to make peace-on your terms.
A.L.: Leave me the fuck alone!!!!!!
Graham: regardless of outcome
Graham: Trying to stay true to my word. It's all I have and it's been tarnished bad. I pray for you every day, and always will. After court trial, I won't bother you
Graham: I'm not bill Thomas I won't hate or slander you
Graham: I pray for peace over your heart. Over your emotions, and I pray God himself walk you through forgiveness
Graham: I DON'T A RELATIONSHIP OR FRIENDSHIP with you just PEACE Marie
Graham: If you do nothing else on earth, listen to the video of her and I talking and she saying "I tricked her into telling me everything-then told her you were
Graham: broke and you would flip her life upside down if she didn't run"
Graham: I will fight tooth and nail legally to clear myself
Graham: I will not slander your name or speak ill at all. In nothing.
Graham: Did u get your stuff back
Graham: Your Oprah tour Atlanta tickets came in the mail
Graham: Love the back to school fashion show are you looking for sponsors? Would love to sponsor it
Graham: Would love to pray with you for peace
Graham: I won't EVER contact you just show some grace here so we don't end up in a full trial with dirty laundry aired. All asking, I will even sign a no contact
Graham: agreement
Graham: 8/6/2014 water bill, adt, sprint, direct tv, Boone electric bills paid
Graham: Water 40, adt 50, Sprint 100 direct tv 130, electric 150
Graham: I know u noticed those bills paid
Graham: Won't change my will, won't change my life insurance policies, won't stop praying for you, but certainly won't pursue you. I'm done there for good.
Graham: Leave me the fuck alone!!!!!![4]
*415 Graham: I will take a polygraph test to prove im bring honest
At 10:16 p.m., Graham initiated another series of texts with A.L.:[5]
Graham: U fucking Regis mcbride again
Graham: I want my life back I have no intentions on bothering u
Graham: U let tammie lie to you, you let Angie lie to you
Graham: And I just
On August 29, 2014, Graham again contacted A.L. via text message using the same phone number. That message stated:[6]
Graham: Be faithful with your love. God truth will be revealed my promises will be kept and shown/proved to be true. Forgiveness and Gods purpose for our lives will be
Graham: displayed and at the end of the I'm going to be right here if you ever call and need me.
Graham: I love you [A.L.], doing everything in "my" power to make things right while trusting on HIM for the results. Goodnight
A.L. reported Graham's violation of the full order of protection to Deputy Vessar on September 2, 2014.
Deputy Vessar contacted Graham on September 19, 2014. Deputy Vessar told Graham "There is an order of protection against you by [A.L.]." Graham responded, "I know that." Deputy Vessar told Graham that the full order of protection was dated August 6, 2014. Graham responded, "I know." Graham told Deputy Vessar that (904) 373-9763 was not his phone number. Graham denied sending A.L. text messages. Deputy Vessar told Graham that he was not allowed to contact A.L. Graham became angry and told Deputy Vessar not to contact him again.
Graham again contacted A.L. via text message on September 24, 2014, using the (904) 373-9763 phone number. Graham wrote, "You're beyond beautiful and praying for your success is a guilty pleasure of mine. Be fearless."[7]
On November 1, 2014, A.L. held a grand opening for her clothing business located at 1205 Rangeline in Columbia, Missouri. A.L.'s son, R.T., was at the store assisting with the grand opening when he received a phone call from (904) 373-9763. R.T. answered the phone and recognized Graham's voice. R.T. did not speak with Graham and, instead, put the phone down and walked away. Graham made several calls to R.T.'s phone, and each time, R.T. would answer the phone, set the phone down, and walk away. Graham then sent two text messages to R.T. from phone number (904) 373-9763 at 2:14 p.m. R.T. showed the text messages to A.L. and forwarded them to her phone. Those text messages stated,[8] "I'm on log providence road right now about to set this shit in flames," and "Bloodbath time." A.L. lived on Log Providence Road, approximately thirty minutes south of downtown Columbia, with her minor children, who were twelve and five at the time. When Graham sent the text messages to R.T., A.L.'s minor children were in the home. A.L. was "terrified that [her] children were in danger."
Within a few minutes of Graham's texts to R.T., Graham placed an anonymous call to the information desk at the Boone County Sheriff's Department using phone number (817) 300-9091, the same number Deputy Vessar had used to reach Graham.
*416 During the anonymous phone call, Graham said that "he was in route to a business to kill the owners" and that "it was going to be a bloodbath." While Graham did not name the business, he stated the business was located at 1205 Rangeline and that A.L. was the owner. Graham said that "he had about ten guns," and that "he had a ten-minute ETA" and "might be arriving in a taxi." The information desk employee relayed information about the call to the Columbia Police Department at 2:20 p.m., approximately six minutes after Graham's texts to R.T.
At least four officers responded to A.L.'s store at 2:37 p.m. Officer John Hoff ("Officer Hoff") of the Columbia Police Department spoke with A.L., who appeared upset by the situation. A.L. showed Officer Hoff the text messages that R.T. had received from Graham. Officer Hoff testified that the wording of the text messages "appeared to be the same or close to the wording that had been dispatched from the Boone County info center of-involving a bloodbath."
The State charged Graham with two counts of aggravated stalking in violation of section 565.225.3.[9] Count I of the first amended information alleged that:
on or between August 14, 2014, and August 28, 2014, ... [Graham] purposely harassed A.L. by communicating with A.L. through text messages, and thereby would have caused a reasonable person under the circumstances to be frightened, intimidated, or emotionally distressed, and at least one of the acts constituting the course of conduct is in violation of an order of protection, and [Graham] received actual notice of such order.
Count II of the first amended information alleged that
on or about November 1, 2014, ... [Graham] purposely harassed A.L. by sending text messages to A.L.'s son, R.T., and calling the Boone County Sheriff's Department, and thereby would have caused a reasonable person under the circumstances to be frightened, intimidated, or emotionally distressed, and made a credible threat by sending text messages stating, "I'm on log providence road right now about to set this shit in flames" and "bloodbath time," and calling the Boone County Sheriff's Department stating he had 10 guns and was on his way to kill the owner of the business located at 1205 Rangeline and that it will be a "bloodbath."[10]
After a trial on October 4, 2016, the jury found Graham guilty of both counts. The trial court sentenced Graham in accordance with the jury's recommendation. For Count I, Graham was sentenced to six months in the Boone County jail, and for Count II, Graham was sentenced to one year in the Boone County jail and received a $5,000 fine. Graham's jail sentences were ordered to run consecutively. However, the trial court suspended the execution of Graham's sentences and placed him on probation for five years on the condition that he not have contact with A.L. or her family, including her children.
Graham appeals.[11]
*417 Standard of Review
" 'Appellate review of sufficiency of the evidence is limited to whether the state has introduced sufficient evidence from which a reasonable juror could have found each element of the crime beyond a reasonable doubt.' " State v. Steidley , 533 S.W.3d 762, 768 (Mo. App. W.D. 2017) (quoting State v. Hosier , 454 S.W.3d 883, 898 (Mo. banc 2015) ). Reviewing the sufficiency of the evidence " 'is not an assessment of whether the Court believes that the evidence at trial established guilt beyond a reasonable doubt but rather a question of whether, in light of the evidence most favorable to the State, any rational fact-finder could have found the essential elements of the crime beyond a reasonable doubt.' " State v. Miller , 372 S.W.3d 455, 463 (Mo. banc 2012) (quoting State v. Nash , 339 S.W.3d 500, 509 (Mo. banc 2011) ). In reviewing the sufficiency of the evidence, we view the evidence and all reasonable inferences drawn therefrom in the light most favorable to the verdict, disregarding any evidence and inferences that are contrary to the verdict. Steidley , 533 S.W.3d at 768. Further, " '[w]e defer to the jury's credibility determinations, recognizing the jury was entitled to believe all, some, or none of the testimony of the witnesses.' " Id. (quoting State v. Wade , 467 S.W.3d 850, 853 (Mo. App. W.D. 2015) ).
Analysis
Graham presents three points on appeal, each of which argues that the trial court erred in overruling Graham's motion for judgment of acquittal at the close of the evidence because there was insufficient evidence to support the essential elements of aggravated stalking.
"A person commits the offense of stalking if he 'purposely, through his or her course of conduct, harasses or follows with the intent of harassing another person.' " State v. Hardin , 429 S.W.3d 417, 422 (Mo. banc 2014) (quoting section 565.225.2). The offense is elevated to aggravated stalking if, in committing the offense of stalking, a person's course of conduct includes one of five statutory aggravators. Id. at 422-23. Section 565.225.3, which defines aggravated stalking, provides:
A person commits the crime of aggravated stalking if he or she purposely, through his or her course of conduct, harasses or follows with the intent of harassing another person, and:
(1) Makes a credible threat; or
(2) At least one of the acts constituting the course of conduct is in violation of an order of protection and the person has received actual notice of such order; or
(3) At least one of the actions constituting the course of conduct is in violation of a condition of probation, parole, pretrial release, or release on bond pending appeal; or
(4) At any time during the course of conduct, the other person is seventeen years of age or younger and the person harassing the other person is twenty-one years of age or older; or
(5) He or she has previously pleaded guilty to or been found guilty of domestic assault, violation or an order of protection, or any other crime where the other person was the victim.
Pursuant to Count I, the State alleged that Graham committed aggravated stalking because he harassed A.L. with a course of conduct that included violation of a full order of protection about which Graham *418 had actual notice. Section 565.225.3(2). Pursuant to Count II, the State alleged that Graham committed aggravated stalking because he harassed A.L. with a course of conduct that included a credible threat. 565.225.3(1).
Sufficiency of the Evidence to Support Conviction for Count I (Points One and Three)
Graham's first and third points on appeal challenge the sufficiency of the evidence to support his conviction for Count I. Count I charged Graham with purposely harassing A.L. through a course of conduct by sending A.L. text messages between August 14, 2014, and August 28, 2014, in violation of a full order of protection about which Graham had actual knowledge. At trial, the State's verdict director for Count I was even more specific, and required the jury to find that Graham harassed A.L. through a course of conduct by sending A.L. text messages on August 26, 2014.
To prove that Graham committed aggravated stalking as charged in Count I, the State was required to establish four elements: (1) Graham, through a course of conduct; (2) purposely harassed A.L.; (3) one of the acts constituting the course of conduct was in violation of the full order of protection; and (4) Graham had actual knowledge of the full order of protection. Section 565.225.3(2). Graham challenges the sufficiency of the evidence to establish the first and fourth elements.
Graham's first point on appeal concerns the sufficiency of the evidence to establish the fourth element: Graham's actual knowledge of the full order of protection. While the term "actual notice" as it is used in section 565.225.3(2) is not statutorily defined, our Supreme Court has analogously considered the notice due process demands prior to being subject to arrest for violating an order of protection pursuant to section 455.085.8, RSMo 1994. State v. Gentry , 936 S.W.2d 790, 792-93 (Mo. banc 1996). Gentry held that "notice is sufficient only if it arrives before the fact, when knowledge of the acts the statute forbids can, if heeded, permit a person to conform her conduct to the demands of the law." Id. "[A] reviewing court may properly conclude that a defendant had actual notice of the full order of protection even though the defendant did not have legal notice and that actual notice was sufficient to meet the requirements of due process." Id. ; see also State v. Burton , 320 S.W.3d 170, 175 (Mo. App. E.D. 2010) (holding that there was insufficient evidence to support a conviction for violation of an order of protection because the State adduced no evidence that the defendant had knowledge, legal or actual, of the order of protection or its contents); State v. McMullin , 136 S.W.3d 566, 573 (Mo. App. S.D. 2004) (holding that there was insufficient evidence to support a conviction for violation of an order of protection because the State failed to adduce evidence that the defendant had knowledge of the order of protection and its prohibitions at the time he violated the order).
To establish the fourth element of aggravated stalking as charged in Count I, the State was thus require to prove that when Graham sent text messages to A.L. on August 26, 2014, Graham knew about the full order of protection and knew it prohibited him from communicating with A.L. Graham acknowledges that to sustain this burden, the State was not obligated to prove that he received legal notice of the full order of protection.[12] Graham argues, however, that there was insufficient evidence *419 to establish that he had actual knowledge of the full order of protection and its contents when he texted A.L. on August 26, 2014. Graham asserts that the only evidence presented at trial regarding his knowledge on August 26, 2014, was the evidence regarding Graham's conversation with Deputy Vessar during which Graham acknowledged the existence of the order. According to Graham, his acknowledgment of the existence of the full order of protection was insufficient to establish that he had knowledge of the prohibitions in the order. Graham further argues that the jury heard no evidence to permit it to determine whether his conversation with Deputy Vessar took place before his text messages with A.L.
Graham's view of the reasonable inferences that could be drawn from the evidence is too narrow. Graham's conversation with Deputy Vessar on August 26, 2014, a conversation initiated by Graham, established that Graham knew about the full order of protection, as Graham told Deputy Vessar that "he had been in the area" to "go[ ] to court for his order-of-protection hearing with [A.L.]" and that "he'd taken care of all of that." Though the State could have done a more thorough job of presenting evidence regarding Graham's knowledge of the full order of protection and its content on August 26, 2014,[13] it is nonetheless reasonable to infer from Graham's conversation with Deputy Vessar that Graham knew about the full order of protection, and thus its prohibitions, on August 26, 2014. This inference can be drawn whether Deputy Vessar spoke with Graham before or after the texts sent to A.L., as it is plain that Graham knew about the full order of protection independent of his conversation with Deputy Vessar.
In addition, the conversation between Graham and Deputy Vessar is not the only evidence on which the jury could have relied to infer that Graham had actual knowledge of the full order of protection and its content before texting A.L. on August 26, 2014. The text messages Graham sent A.L. on August 26, 2014, also support the inference that Graham knew he was prohibited from communicating with A.L. In the third text message sent by Graham to A.L. on August 26, 2014, at 5:28 p.m., Graham stated, "I'm not trying to reconcile or contact you or anything." (Emphasis added.) Graham's effort to characterize his text communication as something other than "contact" permits the inference that Graham knew full well he was not supposed to be "contacting" A.L.
Sufficient evidence was presented to permit the jury to conclude beyond a reasonable doubt that Graham knew about the full order of protection, and knew that he was not supposed to communicate with A.L., at the time Graham sent text messages to A.L. on August 26, 2014. Graham's first point on appeal is without merit.
Graham's third point on appeal concerns the sufficiency of the evidence to establish the first element of aggravated stalking as charged in Count I: course of conduct. "Course of conduct" is statutorily defined as "a pattern of conduct composed of two or more acts, which may include communication by any means, over a period of time, however short, evidencing a continuity of purpose." Section *420 565.225.1(1). Graham argues that the text messages he sent to A.L. on August 26, 2014, cannot be divided into separate acts, and thus fail to qualify as a course of conduct.
Graham relies on State v. Sigmon , 517 S.W.3d 653 (Mo. App. E.D. 2017), to argue that his text messages to A.L. on August 26, 2014 were a single, continuous conversation. In Sigmon , the defendant was convicted of aggravated stalking based on repeated verbal threats he made to a police officer during his arrest and transport to the county jail. Id. at 655-57. The defendant was one of several persons at the scene of a domestic disturbance, and he repeatedly threatened to kill everyone at the scene. Id. at 655. After intermittently yelling threats, the defendant pointed toward two police officers and said, "You fucking---. I'm going to kill you," before walking toward the officers with a raised closed fist. Id. An officer wrestled the defendant to the ground and handcuffed the defendant with the assistance from another officer. Id. at 655-56. After he was handcuffed, the defendant continued to threaten the police officers. Id. at 656. While the defendant was being transported to the county jail, the defendant threatened to physically and sexually assault an officer's daughter. Id.
The defendant argued on appeal that his threats did not meet the threshold for "course of conduct." Id. at 658. The State countered that "the multiple threats made by [the defendant] during his arrest and transport to the county jail were separate acts evidencing a continuity in purpose in harassing [the police officer so as to] satisfy the requirements of 'course of conduct.' " Id. Our Eastern District concluded that "[t]he record reveals no significant separation in time or space from which [the defendant] could reflect on his behavior." Id. at 661. "[W]ithout any meaningful separation of space and time between [the defendant's] actions directed toward [the officer], we are unwilling to conclude that each threat [the defendant] made during the encounter constituted a separate and distinct act." Id. Thus, the Eastern District concluded that there was insufficient evidence to demonstrate that the defendant engaged in a course of conduct. Id.
Graham's reliance on Sigmon is unavailing. Even presuming, as Graham argues, that multiple text messages should be viewed as a single conversation, we cannot ignore the significant gap in time between the two text conversations Graham initiated with A.L. on August 26, 2014. Graham initiated his first text conversation with A.L. at 5:28 p.m. on August 26, 2014. Nearly five hours later, at 10:16 p.m., Graham initiated his second text conversation with A.L. Unlike the defendant in Sigmon , Graham had substantial time to "reflect on his behavior" between the first and second conversation he initiated with A.L. As such, sufficient evidence was presented to permit the jury to conclude beyond a reasonable doubt that Graham engaged in a course of conduct. Graham's third point on appeal has no merit.
Graham's first and third points on appeal are denied.
Sufficiency of the Evidence to Support Conviction for Count II (Point Two)
Graham's second point on appeal challenges the sufficiency of the evidence to support his conviction for Count II. Count II charged Graham with purposely harassing A.L. through a course of conduct in which he made a credible threat on November 1, 2014. Specifically, the State alleged that Graham sent text messages to R.T. and called the Boone County Sheriff's Department on November 1, 2014, for the purpose of harassing A.L. with a credible threat. To prove that Graham committed aggravated stalking as charged in Count II, the State was thus required to establish that: (1) Graham, through a course of *421 conduct; (2) purposely harassed A.L.; and (3) made a credible threat. Section 565.225.3(1). Graham's second point on appeal challenges only the sufficiency of the evidence to establish the second element: whether Graham purposely harassed A.L.
"Harasses" is statutorily defined as "to engage in a course of conduct directed at a specific person that serves no legitimate purpose, that would cause a reasonable person under the circumstances to be frightened, intimidated, or emotionally distressed." Section 565.225.1(3). "A person 'acts purposely', or with purpose, with respect to his conduct or to a result thereof when it is his conscious object to engage in that conduct or to cause that result." Section 562.016.2. Purposely equates with specific intent. State v. Joyner , 458 S.W.3d 875, 885 (Mo. App. W.D. 2015). "In the case of section 565.225.2, ... 'purposely' modifies 'harasses,' and 'purposely harasses' must occur through a course of conduct." Id. at 885-56. Thus, Graham is correct that the State was required to adduce sufficient evidence to permit the jury to conclude that, in sending text messages to R.T. and in calling the Boone County Sheriff's Department, Graham's conscious object was to harass A.L.
Graham does not contest that the evidence permitted the jury to conclude that his purpose in calling the Boone County Sheriff's Department was to harass A.L. Instead, he challenges only whether the evidence was sufficient to permit the jury to conclude that his purpose in texting R.T. was to harass A.L.
The evidence at trial established that R.T. was A.L.'s adult child; that R.T. did not live on Log Providence Road; that A.L. lived on Log Providence Road with her minor children; and that R.T. and Graham were friends independent of A.L.'s romantic relationship with Graham. Given this evidence, the jury could reasonably conclude that Graham's text messages to R.T. on November 1, 2014 threatening that "I'm on log providence road right now about to set this shit in flames," and "Bloodbath time" served no purpose other than to threaten or harass A.L. It was reasonable for the jury to infer that Graham anticipated that R.T. would do exactly what R.T. did when he received Graham's threatening texts-he immediately brought the texts to A.L.'s attention.
Graham argues that, if he intended to harass A.L., he would have explicitly indicated an intent to harm A.L. in his texts, or he would have sent his texts to A.L., and not R.T. Graham's argument ignores our standard of review. Our task is not to determine whether Graham's conscious object to harass A.L. would have been more obvious had Graham used some other means of communication. Rather, our task is simply to determine whether, when viewed in the light most favorable to the verdict, the evidence and all reasonable inferences allowed a rational fact-finder to conclude that Graham's conscious object in sending text messages to R.T. was to harass A.L. See Steidley , 533 S.W.3d at 768. A rational fact-finder could have reached that conclusion. "Missouri law recognizes that a threat may be delivered via intermediary." State v. Bernhardt , 338 S.W.3d 830, 834 (Mo. App. E.D. 2011). Sufficient evidence permitted the jury to conclude that Graham's conscious objective was to harass A.L. when he sent text messages to R.T. on November 1, 2014.
Graham's second point on appeal is denied.
Conclusion
The trial court's judgment is affirmed.
All concur

All typographical and grammatical errors appear in the actual text messages.

We are uncertain why Graham told A.L. to leave him alone at this point, as she was no longer responding to his text messages.

See supra note 3.

See supra note 3.

See supra note 3.

See supra note 3.

There were no relevant statutory amendments made between August 14, 2014 (the earliest date on which the State alleged crimes were committed), and November 1, 2014 (the latest date on which the State alleged crimes were committed). Thus, all statutory references are to RSMo 2000 as supplemented through November 1, 2014.

The State also charged Graham with one count of harassment in violation of section 565.090, but the jury acquitted Graham of this charge.

"When 'a sentence is imposed but then its execution is suspended, the judgment is final and the defendant has a right of immediate appeal.' " Bearden v. State , 530 S.W.3d 504, 506 (Mo. banc 2017) (quoting State ex rel. Poucher v. Vincent , 258 S.W.3d 62, 66 (Mo. banc 2008) ).

There is no evidence in the record to suggest that Graham was served with the full order of protection, as he had been the ex parte order of protection.

Though not presented as evidence by the State, and thus immaterial to our conclusion that sufficient evidence supported the inference that Graham had actual knowledge of the full order of protection, the docket sheet in the full order of protection proceedings reflects that on August 12, 2014, counsel for Graham filed a Motion to Set Aside Full Order of Protection, which motion was set for hearing on August 27, 2014-the day after Graham initiated contact with Deputy Vessar to advise that he was in town to go "to court for his order-of-protection hearing."